# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ERIC A. HICKS,<br><br>Defendant. | Criminal Action No. 93-97-2 (BAH)<br><br>Chief Judge Beryl A. Howell |

## MEMORANDUM OPINION

Having served approximately 340 months of a life sentence of imprisonment, defendant Eric A. Hicks now seeks compassionate release "to reduce his risk of dying from Covid-19" at Federal Correctional Institute Schuylkill ("FCI Schuylkill"), where he is currently incarcerated, and "to recognize his substantial and commendable work towards rehabilitation while imprisoned."  Def.'s Emergency Mot. Compassionate Release Under 18 U.S.C. § 3582(c)(1)(A) ("Def.'s Mot.") at 5, ECF No. 732.  Defendant was sentenced, in 1994, to life in prison after a jury found him guilty of drug trafficking and racketeering conspiracy offenses, stemming from his leadership of the "First Street Crew," which, from early 1988 until the arrest of defendant and other members approximately five years later, "sold crack cocaine and engaged in 'violent activities'" in Washington, D.C.  *United States v. White* ("*White II*"), 413 F. Supp. 3d 15, 18 (D.D.C. 2019), *rev'd*, 984 F.3d 76 (D.C. Cir. 2020) (quoting *United States v. White* ("*White I*"), 116 F.3d 903, 909–11 (D.C. Cir. 1997)).  The government opposes defendant's early release.  Gov't Opp'n Def.'s Emergency Mot. Compassionate Release ("Gov't Opp'n") at 1, ECF No. 737.  For the reasons set forth below, defendant's motion is denied.[1]

---

[1] This case was reassigned to the undersigned Chief Judge in December 2016.  Min. Entry (Dec. 8, 2016); *see* Local Crim. R. 57.14(d).

I.      **BACKGROUND**

Starting in early 1988, for approximately five years until his arrest, defendant was a member of the "First Street Crew," a street gang that "sold 'large amounts of crack' in the area of First and Thomas Streets, N.W." in Washington, D.C.  *White II*, 413 F. Supp. 3d at 19 (quoting *White I*, 116 F.3d at 909).  He "eventually 'took charge when . . . [his co-defendant] White was out of the neighborhood, i.e., in prison.'"  *Id.* (omission in original) (quoting *White I*, 116 F.3d at 909).  "The First Street Crew's 'drug operation' involved 'violent activities,' including the murder and intimidation of witnesses against them."  *Id.* (quoting *White I*, 116 F.3d at 909).

In March 1993, defendant, along with four co-defendants, was charged in a 26-count indictment with, *inter alia*, "conspiracy to distribute cocaine base, RICO conspiracy, and numerous individual counts of drug distribution."  *White I*, 116 F.3d at 909–10; *see also* Indictment (Retyped) (Jan. 28, 1994) at 2–36, ECF No. 228.  At the conclusion of a three-month jury trial, in February 1994, defendant was found guilty of (1) conspiracy to distribute and possess with intent to distribute fifty grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iii), 846 (1993) (Count 1); (2) Racketeer Influenced and Corrupt Organization ("RICO") conspiracy, in violation of 18 U.S.C. § 1962(d) (1993) (Count 5); (3) distribution of, or unlawful possession with intent to distribute, on different dates, a detectable amount of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (1993) (Counts 8 and 10); and (4) unlawful distribution of, or unlawful possession with intent to distribute, five grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(iii) (1993) (Count 11). *See* Judgment & Commitment Order at 1, ECF No. 301.

The presiding Judge sentenced Hicks to life in prison, highlighting his "very large distribution of . . . twenty-one kilos" of crack cocaine and the Crew's "intimidation or worse of witnesses."  Sentencing Tr. (May 11, 1994) ("May 11 Sentencing Tr.") at 93:1–2, 12–13, ECF No. 354; *see also id.* at 132:8–12.  In assessing the then-mandatory applicable sentencing range under the U.S. Sentencing Commission's *Guidelines Manual*, the court calculated that defendant's base offense level of 42 was enhanced by ten levels for possession of a weapon, his leadership role in the First Street Crew, *id.* at 132:8–133:3, obstruction of justice for "brib[ing]" a First Street Crew member "not to give information up to the grand jury" investigating defendant for murder, Sentencing Tr. (May 9, 1994) at 84:6–7, ECF No. 353; *see also id.* at 84:3–85:1; May 11 Sentencing Tr. at 133:1–3, and fleeing from law enforcement in a high-speed car chase that led to crashes with four vehicles, resulting in a total offense level of 52, May 11 Sentencing Tr. at 133:4–6; *see* Presentence Report ("PSR") ¶¶ 71, 90, ECF No. 713.  This total offense level was reduced to the maximum level of 43 pursuant to U.S.S.G. § 5A, comment (n.2.).  May 11 Sentencing Tr. at 133:7–8; PSR ¶ 94.  Defendant's criminal history category was III, "based on a prior conviction for stealing a car and the fact that he was charged in this federal criminal case while on probation in an unrelated D.C. Superior Court case."  *White II*, 413 F. Supp. 3d at 25 (internal quotation marks and citations omitted).  His total offense level of 43, combined with his criminal history category of III, resulted in a mandatory sentencing range under the Guidelines of life imprisonment.  May 11 Sentencing Tr. at 133:8–17; PSR ¶ 117.

Defendant was accordingly sentenced to concurrent terms of life in prison on the two conspiracy convictions and terms of years on the remaining counts, followed by concurrent terms of five years of supervised release on each count.  Judgment & Commitment Order at 1–3.  He pursued a direct appeal and collateral motions attacking his conviction and sentence, none of

which were successful.  *See White II*, 413 F. Supp. 3d at 25–26.  In 2019, defendant filed a

motion for a sentence reduction pursuant to the First Step Act of 2018 ("First Step Act"), Pub. L.

No. 115-391, 132 Stat. 5194.  *See* Def.'s Mot. Appointment of Counsel & Reduction of

Sentence, ECF No. 684; Def.'s Emergency Suppl. Mot. Reduce Sentence Pursuant to the First

Step Act of 2018, ECF No. 688.  That motion was denied, except that defendant's sentence for

his conviction on one of the drug distribution charges was reduced to time served.  *White II*, 413

F. Supp. 3d at 52–53.  On appeal, the D.C. Circuit reversed and remanded.  *United States v.

White* ("*White III*"), 984 F.3d 76, 93 (D.C. Cir. 2020).  Defendant's renewed motion for

reduction in sentence under the First Step Act is currently pending, with briefing under the

schedule proposed by the parties to be completed by June 11, 2021.  *See* Def.'s Suppl. Mot.

Imposition of Reduced Sentence Under Section 404 of the First Step Act, ECF No. 731; Min.

Order (Mar. 4, 2021); Min. Order (Apr. 26, 2021).

Due to the ongoing COVID-19 pandemic, on January 14, 2021, defendant submitted a

request for consideration of compassionate release to the warden of his facility.  Def.'s Mot., Ex.

13, Letter from Joanna Munson Perales, Att'y, Off. of Fed. Pub. Defender, D.C., to Warden, FCI

Schuylkill (Jan. 14, 2021) ("Warden Request") at 1–2, ECF No. 732-2.  That request was denied

on February 8, 2021.  *Id.*, Ex. 13, Letter from Scott Finley, Warden, FCI Schuylkill, to Joanna

Munson Perales, Att'y, Off. of Fed. Pub. Defender, D.C. (Feb. 8, 2021) ("Warden Denial") at 3–

4, ECF No. 732-2.[2]  On February 16, 2021, defendant tested positive for COVID-19.  Def.'s

Mot. at 19; Gov't's Opp'n at 5; *see also* Def.'s Mot., Ex. 11, Bureau of Prisons ("BOP") Medical

Records ("Medical Records") at 3–4, ECF No. 734.  About six weeks later, on March 29, 2021,

---

[2]    Defendant also requested that the warden "consider him for home confinement under the CARES Act,"
Warden Request at 1, which request was denied, Warden Denial at 4.  He does not seek placement to home
confinement in the pending motion.  *See* Def.'s Mot.

simultaneous with the submission of his renewed motion for reduction in sentence under the First

Step Act, defendant filed the pending Emergency Motion for Compassionate Release.  Def.'s

Mot.  The following day, he received his first dose of the Pfizer-BioNTech COVID-19 vaccine.

Gov't's Opp'n, Ex. 1, BOP Health Services Immunizations ("Vaccination Record"), ECF No.

737-1.  Under applicable guidance from the Centers for Disease Control and Prevention

("CDC"), he will receive his second dose within three to six weeks of the first dose, or by May

11, 2021.  *Id.* at 14.  The parties completed their briefing on the pending compassionate-release

motion on April 20, 2021.  *See* Def.'s Reply Supp. Compassionate Release ("Def.'s Reply"),

ECF No. 738.  The motion is now ripe for review.

## II.    LEGAL STANDARD

"Federal courts are forbidden, as a general matter, to 'modify a term of imprisonment

once it has been imposed;' but the rule of finality is subject to a few narrow exceptions."

*Freeman v. United States*, 564 U.S. 522, 526 (2011) (quoting 18 U.S.C. § 3582(c)).  As

originally enacted, one such exception, codified in 18 U.S.C. § 3582(c)(1)(A), empowered the

BOP Director to "petition the court for a reduction in sentence," S. Rep. No. 98-223, at 118

(1983), and gave courts the authority to grant those petitions if, "after considering the factors set

forth in [18 U.S.C.] section 3553(a) to the extent that they are applicable," Sentencing Reform

Act of 1984, Pub. L. No. 98-473, tit. II, ch. II, § 212(a)(2), 98 Stat. 1837, they "found that the

reduction was justified by 'extraordinary and compelling reasons,'" S. Rep. No. 98-223, at 118.

The First Step Act expanded the exception in § 3582(c)(1)(A) to authorize a defendant directly to

file a motion for such compassionate release with the district court after he exhausts any

"administrative rights to appeal a failure of the [BOP] to bring a [compassionate-release]

motion" on his behalf or he waits at least "30 days" after he delivers his request for compassionate release to "the warden of [his] facility."  18 U.S.C. § 3582(c)(1)(A).

In resolving motions for compassionate release, the court may reduce a term of imprisonment only "after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable," *id.*, and upon making two findings: first, that "extraordinary and compelling reasons warrant such a reduction," *id.* § 3582(c)(1)(A)(i);[3] and, second, "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," *id.* § 3582(c)(1)(A).[4]

## III.   DISCUSSION

Defendant contends that both (1) the risks associated with the COVID-19 pandemic, in combination with his medical condition of obesity, and (2) the combined effect of changes in the legal landscape since his 1994 sentencing, his relative youth at the time of the offenses, and his rehabilitation while imprisoned, establish "extraordinary and compelling reasons" within the meaning of 18 U.S.C. § 3582(c)(1)(A).  Def.'s Mot. at 23–34; Def.'s Reply at 7–25.  The government counters that neither set of circumstances justifies defendant's early release.  Gov't's Opp'n at 11–20, 21–23.[5]  Consideration of each of the two proffered "extraordinary and compelling reasons" follows review of the applicability of the Sentencing Commission's policy

---

[3]     Though not relevant to the instant motion, the court may also reduce a prisoner's sentence if he is "at least 70 years of age" and "has served at least 30 years in prison," when BOP has determined "that the defendant is not a danger to the safety of any other person or the community, as provided under [18 U.S.C. §] 3142(g)."  18 U.S.C. § 3582(c)(1)(A)(ii).

[4]     The Sentencing Commission is tasked, in its organic statute, with promulgating general policy statements regarding "the sentence modification provisions set forth in section[] . . . 3582(c) of title 18," 28 U.S.C. § 994(a)(2)(C), and "describ[ing] what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples," *id.* § 994(t).

[5]     The parties do not dispute that defendant has exhausted his administrative remedies as required by 18 U.S.C. § 3582(c)(1)(A).  *See* Def.'s Mot. at 23; Gov't's Opp'n at 10 n.1.

statement at U.S.S.G. § 1B1.13, defining "extraordinary and compelling reasons" that warrant a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A), to defendant's motion.

### A.     Applicability of U.S.S.G. § 1B1.13

At the outset, the parties dispute the weight owed to the Sentencing Commission's policy statement at U.S.S.G. § 1B1.13.  U.S.S.G. § 1B1.13 states that, "[u]pon motion of the Director of the [BOP] under 18 U.S.C. § 3582(c)(1)(A)," a reduction of a term of imprisonment may be warranted, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," U.S.S.G. § 1B1.13, when the court makes three determinations: (1) "extraordinary and compelling reasons warrant the reduction," *or* the defendant meets certain age and minimum incarceration period criteria, *id.* § 1B1.13(1)(A)–(B); (2) the defendant poses no "danger to the safety of any other person or to the community," *id.* § 1B1.13(2); and (3) "the reduction is consistent with [the] policy statement," *id.* § 1B1.13(3).  The commentary to this policy statement describes four "circumstances" that satisfy "extraordinary and compelling reasons warrant[ing] the reduction," *id.*, § 1B1.13, cmt. n.1(A)–(D), including "[o]ther [r]easons" found by the BOP Director to present an extraordinary and compelling reason "other than, or in combination with," the reasons specified in the policy statement, *id.* § 1B1.13, cmt. n.1(D).[6] This Court has recognized elsewhere that the current global pandemic may, in some circumstances, "'present[] such an other reason.'"  *United States v. Tobias*, Crim. A. No. 19-143

---

[6]      The other three "extraordinary and compelling" circumstances described in the commentary to U.S.S.G. § 1B1.13 are not invoked and have no relevance here.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)–(C) (describing defendant who "is suffering from a terminal illness" or has chronic and "substantially diminishe[d] . . . ability . . . to provide self-care" within the prison environment; who is at least 65 years old, with "a serious deterioration in physical or mental health," after serving at least 10 years or 75 percent of the prison term, "whichever is less;" or for whom "[f]amily [c]ircumstances" involve "[t]he death or incapacitation of the caregiver of the defendant's minor child or minor children" or "the incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner").

(BAH), 2020 WL 4673414, at *4 (D.D.C. Aug. 12, 2020) (alteration in original) (quoting *United States v. Morris*, Crim. A. No. 12-154 (BAH), 2020 WL 2735651, at *7 (D.D.C. May 24, 2020)).

U.S.S.G. § 1B1.13 was last substantively amended by the Commission on November 1, 2016 and therefore has not been updated since the enactment of the First Step Act, due to the lack of a voting quorum on the U.S. Sentencing Commission.  *See* U.S. Sent'g Comm'n, *2020 Annual Report and Sourcebook of Federal Sentencing Statistics* ("*2020 Annual Report*") 2 (2020), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2020/2020-Annual-Report-and-Sourcebook.pdf.  Consequently, this policy statement is framed to provide guidance in resolving a "motion of the Director of [BOP] under 18 U.S.C. § 3582(c)(1)(A)," U.S.S.G. § 1B1.13, but makes no reference to a motion filed directly by a defendant.  As a result of the Commission's inability to conform U.S.S.G. § 1B1.13 to reflect this new avenue to compassionate release and to accommodate the more expansive view of compassionate release adopted in the First Step Act, defendant argues, the policy statement is "outdated," Def.'s Mot. at 21, and "courts now have nearly unfettered discretion to determine what constitutes extraordinary and compelling circumstances," *id.* at 22; *see also* Def.'s Reply at 1–3.  The government counters that "[i]n light of the statutory command that any sentence reduction be 'consistent with applicable policy statements issued by the Sentencing Commission,' the policy statement should apply to motions filed by defendants as well." Gov't's Opp'n at 10 n.2 (quoting 18 U.S.C. § 3582(c)(1)(A)).

Relying on the statutory direction in the First Step Act that compassionate-release motions be "consistent with applicable policy statements issued by the Sentencing Commission," 18 U.S.C. § 3582(c)(1)(A), this Court has treated U.S.S.G. § 1B1.13 as binding in the compassionate-release context, *see, e.g.*, *United States v. Goldberg*, Crim. A. No. 12-180 (BAH),

2020 WL 1853298, at *4 (D.D.C. Apr. 13, 2020).  The D.C. Circuit has not yet decided the question, but every circuit to have done so has concluded that the current version of U.S.S.G. § 1B1.13 does not apply to motions initiated by defendants and thus this policy statement's definition of "extraordinary and compelling reasons" does not bind district courts resolving compassionate-release motions brought directly by defendants.[7]  Focusing on the word "applicable" in the recently amended § 3582(c)(1)(A), these circuits have determined, "[t]here is as of now no 'applicable' policy statement governing compassionate-release motions filed by defendants . . . , and as a result, district courts are 'empowered . . . to consider *any* extraordinary and compelling reason for release that a defendant might raise.'"  *United States v. McCoy*, 981 F.3d 271, 284 (4th Cir. 2020) (quoting *United States v. Brooker*, 976 F.3d 228, 230 (2d Cir. 2020)).  To the extent any binding limit remains on the exercise of district court discretion to undo a final judgment imposing a term of imprisonment, some courts have cited only the limit imposed by the Sentencing Commission's organic statute, which states that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."  28 U.S.C. § 994(t); *see, e.g.*, *Brooker*, 976 F.3d at 237–38.

Nonetheless, at least one circuit has cautioned that, though it is no longer binding, "[t]he substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of 'extraordinary and compelling reasons'" and that "a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused."  *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020); *cf. United States v. Aruda*,

---

[7]      *See United States v. Aruda*, No. 20-10245, 2021 WL 1307884, at *3–4 (9th Cir. Apr. 8, 2021); *United States v. Shkambi*, No. 20-40543, 2021 WL 1291609, at *3–4 (5th Cir. Apr. 7, 2021); *United States v. Maumau*, No. 20-4056, 2021 WL 1217855, at *10–12 (10th Cir. Apr. 1, 2021); *United States v. McGee*, 992 F.3d 1035, 1048–50 (10th Cir. 2021); *United States v. McCoy*, 981 F.3d 271, 280–84 (4th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180–81 (7th Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108–11 (6th Cir. 2020); *United States v. Brooker*, 976 F.3d 228, 235–36 (2d Cir. 2020).

No. 20-10245, 2021 WL 1307884, at *4 (9th Cir. Apr. 8, 2021) ("The Sentencing Commission's statements in U.S.S.G. § 1B1.13 may inform a district court's discretion for § 3582(c)(1)(A) motions filed by a defendant[.]").  Moreover, Congress's continuing mandate, even after the First Step Act, that any reduction in sentence pursuant to § 3582(c)(1)(A) be "consistent with applicable policy statements issued by the Sentencing Commission" provides a strong textual indication that, when it granted defendants the ability to file directly motions for compassionate release, Congress expected that courts' evaluation of those motions would be guided by the Sentencing Commission's analysis of relevant issues rather than a court-by-court, discretionary interpretation of the phrase "extraordinary and compelling reasons."  The Sentencing Commission's current inability to update its previously applicable policy statements to align with the new procedural pathways to compassionate release created by the First Step Act and the Act's general policy in favor of expanding the availability of compassionate release is no reason to disregard completely the Commission's decades of expertise in assessing the substantive contours of the "extraordinary and compelling reasons" that might justify release in favor of unbounded judicial discretion.[8]

Thus, like other courts to have recognized that "relying on the established standards is preferable to conducting an unmoored inquiry into what qualifies as 'extraordinary and compelling,'" *United States v. Shepard*, Crim. A. No. 07-85 (RDM), 2021 WL 848720, at *4 (D.D.C. Mar. 4, 2021), even if U.S.S.G. § 1B1.13 is not binding, this policy guidance is highly

---

[8]     It bears noting that the Supreme Court has determined that, for sentence-modification proceedings pursuant to 18 U.S.C. § 3582(c)(2), allowing for the reduction of a sentence when the relevant Guidelines range "has subsequently been lowered by the Sentencing Commission," "after considering the factors set forth in § 3553(a)" and "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," the Guidelines remain binding even after the transition to an advisory Guidelines regime.  *See Dillon v. United States*, 560 U.S. 817, 828–30 (2010).  Though the availability of relief under § 3582(c)(2), unlike compassionate release under § 3582(c)(1)(A), turns on a subsequent revision to the applicable Guidelines range, the mandatory deference owed to the Guidelines in this analogous context counsels in favor of looking to U.S.S.G. § 1B1.13 for guidance in resolving motions for compassionate release.

persuasive authority in resolving motions for compassionate release, *see, e.g.*, *United States v. Minicone*, No. 5:89-CR-173, 2021 WL 732253, at *2 (N.D.N.Y. Feb. 25, 2021) (noting that U.S.S.G. § 1B1.13's "outdated guidance documents remain 'helpful in defining a vague standard'" (quoting *United States v. Ebbers*, 432 F. Supp. 3d 421, 426 (S.D.N.Y. 2020)).  The "extraordinary and compelling reasons" suggested by defendant to justify his release pursuant to § 3582(c)(1)(A) are considered against this backdrop.

**B.    Defendant Has Not Shown Extraordinary and Compelling Reasons Warranting Compassionate Release**

Defendant offers two potential "extraordinary and compelling reasons" for his release. He points, first, to his high vulnerability to serious illness or death from COVID-19 due to his medical condition of obesity, Def.'s Mot. at 32; *see also id.* at 23–32; Def.'s Reply at 7–17, and second, to the combination of "significant changes in the law" since his 1994 sentencing, his age of 17 to 22 years at the time of his offenses, and his rehabilitation during his imprisonment, Def.'s Mot. at 34; *see also id.* at 32–34, 37–55; Def.'s Reply at 17–25.  The government opposes defendant's early release, arguing that "defendant has received his first dose of the COVID-19 vaccination" and recovered from a mild COVID-19 infection, and therefore cannot rely on the combination of his medical conditions and the ongoing pandemic to establish an extraordinary and compelling reason for release, Gov't's Opp'n at 9; *see also id.* at 9–20, and that changes in the relevant law do not justify his release, *id.* at 21–23.  Each of the suggested extraordinary and compelling reasons for release is examined in turn.

**1.    *Defendant's Medical Condition and Risks Associated with COVID-19 Are Not an Extraordinary and Compelling Reason***

Defendant first contends that the prevalence of COVID-19 at FCI Schuylkill, "'coupled with the established fact that [he] has certain preexisting medical conditions that put him at a higher risk of being harmed if he contracts Covid-19, qualifies as an extraordinary and

compelling reason' and warrants a reduction of his sentence."  Def.'s Mot. at 23 (quoting *United States v. Johnson*, 464 F. Supp. 3d 22, 27 (D.D.C. 2020)); *see also id.* at 23–32; Def.'s Reply at 7–17.  As support, he cites his documented medical condition of obesity.  Def.'s Mot. at 3; *see also* Medical Records at 25.  The government acknowledges that defendant's "documented obesity" is a condition that "could place him at an increased risk of negative consequences from COVID-19," Gov't Opp'n at 15, but argues that because "BOP has already vaccinated defendant with the first dose of the Pfizer-BioNTech COVID-19 vaccine," *id.* at 16; *see also* Vaccination Record, and will soon administer his second dose, "[d]efendant's COVID-19 risk is significantly mitigated," Gov't Opp'n at 17.[9]

Though, as the government concedes, defendant's medical condition in combination with the ongoing pandemic might otherwise demonstrate extraordinary and compelling reasons, the fact that he has already received his first dose of the COVID-19 vaccine and will soon receive his second dose substantially diminishes his risks from potential exposure to COVID-19.  The Food and Drug Administration reports that the Pfizer vaccine administered to defendant "was 95% effective in preventing COVID-19 disease among . . . clinical trial participants."[10]  That

---

[9] Defendant further contends that his "age, race, and gender" place him at increased risk for complications from COVID-19 and support a finding that the threat of COVID-19 justifies his early release.  Def.'s Mot. at 32; *see also id.* at 30–32.  As the government points out, current CDC guidance indicates that, while the risk for severe illness from COVID-19 increases with age, "'[t]he greatest risk for severe illness . . . is among those 85 or older.'"  Gov't Opp'n at 16 (quoting CDC, *Older Adults: At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19* (last updated Apr. 16, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html).  Though defendant, at 51 years of age, *see* Medical Records at 2, is at higher risk for severe illness than a younger person, he is not considered to be in a high-risk age category.  Likewise, although, as defendant notes, "'[l]ong-standing systemic health and social inequities have put many people from racial and ethnic minority groups at increased risk of getting sick and dying from COVID-19,'" Def.'s Mot. at 30 (alteration in original) (quoting CDC, *Health Equity Considerations & Racial & Ethnic Minority Groups* (last updated Apr. 19, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html), and some evidence suggests that men may be more likely than women to suffer the most severe effects of COVID-19, *see id.* at 31–32, defendant's vaccination and natural immunity triggered by his mild COVID case mitigates such enhanced risk of severe illness from these factors.

[10] Press Release, Food & Drug Administration, FDA Takes Key Action in Fight Against COVID-19 by Issuing Emergency Use Authorization for First COVID-19 Vaccine (Dec. 11, 2020), https://www.fda.gov/news-events/press-announcements/fda-takes-key-action-fight-against-covid-19-issuing-emergency-use-authorization-first-covid-19.

defendant will soon complete both doses of this highly effective vaccine undercuts his claim that

he must be released to reduce his risk of infection with COVID-19.  *See, e.g.*, *Shepard*, 2021 WL

848720, at \*5 ("Given that [the defendant] received his first dose of the vaccine about two weeks

ago (and, presumably, will receive his second dose in the near future), he cannot show that he

needs to be released from prison to protect him from risks associated with COVID-19."); *United

States v. Wakefield*, Crim. Case No. 1:19-cr-00095-MR-WCM, 2021 WL 640690, at \*3

(W.D.N.C. Feb. 18, 2021) ("Because he has already contracted the virus and recovered without

complication, and because he is in the process of being vaccinated, the Defendant cannot meet

his burden of establishing that his COVID-19 risk is an extraordinary and compelling reason for

his release."); Gov't's Opp'n at 17–18, 18 n.5 (collecting cases).

In addition, as of this writing, BOP has fully vaccinated 93 staff members and 520 of the

1,048 inmates at FCI Schuylkill, for an overall vaccination rate of nearly fifty percent among

inmates.  *See* BOP, *COVID-19 Vaccine Implementation* (last updated Apr. 26, 2021),

https://www.bop.gov/coronavirus/; BOP, *FCI Schuylkill* (last visited Apr. 27, 2021),

https://www.bop.gov/locations/institutions/sch/.  This overall increase in immune protection at

the facility where defendant is housed further reduces his risk of reinfection and accompanying

complications from COVID-19.  *See, e.g.*, *United States v. Jackson*, Case No. 1:19-cr-347

(TNM), 2021 WL 1299439, at \*2 (D.D.C. Apr. 7, 2021) (holding that "statistics" on the number

of inmates and staff members at defendant's facility who "ha[d] received both doses of the

COVID-19 vaccine . . . undermine[d] [his] claims" for compassionate release); *United States v.

Piles*, Crim. A. No. 19-292-5 (JDB), 2021 WL 1198019, at \*3 (D.D.C. Mar. 30, 2021) ("The

Court is hopeful that the risk of reinfection will continue to decrease, as [defendant's facility] has

begun vaccinating inmates and staff."); *United States v. Fields*, Crim. No. 19-0048 (PLF), 2021

WL 780738, at *4 (D.D.C. Mar. 1, 2021) (finding that defendant's "circumstances lack the extraordinary and compelling character required under 18 U.S.C. § 3582(c)(1)(A)" in part because of "BOP's plan to vaccinate inmates" at his facility).

The government also notes that defendant "has recovered from a . . . COVID-19 infection" diagnosed in February 2021, further "minimiz[ing] his risk of contracting it again." Gov't Opp'n at 19.[11]  The CDC currently believes that "[c]ases of reinfection with COVID-19 . . . remain rare," CDC, *Reinfection* (last updated Oct. 27, 2020), https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html, and evidence suggests that this natural immunity from the virus lasts for at least several months, *see, e.g.*, Dr. Francis Collins, *Study of Healthcare Workers Shows COVID-19 Immunity Lasts Many Months*, Nat'l Insts. Health Director's Blog (Dec. 8, 2020), https://directorsblog.nih.gov/2020/12/08/study-of-healthcare-workers-shows-covid-19-immunity-lasts-many-months/ (describing research finding that "acquired immunity from an initial COVID-19 infection offers protection against reinfection for six months or maybe longer").  Defendant was infected just two months ago, *see* Medical Records at 2–4, and therefore will likely remain protected from reinfection until he is fully vaccinated.

Defendant nonetheless asserts, citing to scientific and popular sources, testimony from medical experts, and BOP press releases reporting the deaths of individuals in BOP custody after reinfection, that he remains at high risk from his exposure to COVID-19 despite his earlier

---

[11]   The parties dispute the severity of defendant's COVID-19 infection.  The government submits that he suffered "a largely asymptomatic infection," Gov't Opp'n at 19; *see also id.* at 13–14, a characterization supported by defendant's medical records, *see* Medical Records at 2–4, while defendant states that "he experienced severe fatigue, chills, extreme constipation, vomiting, and fever," Def.'s Mot. at 36; *see also id.*, Ex. 9, Letter from Eric Hicks to Joanna Perales (Feb. 25, 2021), ECF No. 732-2, and continues to show some symptoms "including 'constant dry cough, fatigue, and loss of appetite,'" *id.* at 37 (quoting *id.*, Ex. 1, Hicks Email to the Court (Mar. 17, 2021) ("2021 Hicks Email") at 5, ECF No. 732-2).  For present purposes, this contradiction need not be resolved, as either an asymptomatic or a more serious bout of COVID-19 likely confers some immunity against reinfection.

infection and vaccination.  In support of this claim, he points to the emergence of COVID-19

variants that may be resistant to the antibodies produced by currently available vaccines,

questions in the scientific community about the effectiveness of COVID-19 vaccines among

individuals who are considered medically obese and individuals in high-spread, congregate

settings like prisons, and uncertainty about the duration of natural immunity.  *See* Def.'s Mot. at

10–17, 25–28; Def.'s Reply at 3–17.  Without wholly dismissing any remaining possibility of

reinfection, the lingering risk COVID-19 poses to defendant does not establish an extraordinary

and compelling reason for release, in light of the recency of defendant's initial infection and the

fact that, as the government puts it, by being vaccinated, defendant "is already receiving the most

beneficial treatment currently available to prevent COVID-19 infection, inside or outside of the

BOP."  Gov't's Opp'n at 19; *cf. United States v. King*, Crim. A. No. 18-318 (JDB), 2021 WL

880029, at *4 (D.D.C. Mar. 9, 2021) (finding that a defendant "just barely[] established

extraordinary and compelling reasons" in light of "his medical conditions, the threat of emerging

variants [and] the risk of reinfection," among other factors, where he had yet to be vaccinated

and ten months had passed "since his last infection").

### 2.    *Changes in the Legal Landscape and Defendant's Rehabilitation While Imprisoned Are Not an Extraordinary and Compelling Reason*

Defendant next argues that, beyond his health and the associated risks presented by the

pandemic, "significant changes in the law" governing his sentencing, his relative youth at the

time of the offenses for which he was convicted, and his record of rehabilitation while

incarcerated together constitute an independent extraordinary and compelling reason for release.

Def.'s Mot. at 34; *see also id.* at 37–58; Def.'s Reply at 17–25.  Plainly, U.S.S.G. § 1B1.13 does

not include such considerations in its enumeration of "extraordinary and compelling reasons"

justifying early release.  Nevertheless, defendant observes that, in the wake of the growing

consensus in other circuits that this policy statement does not constrain a district court evaluating

a motion for a compassionate release, a number of courts have weighed similar factors in their

decisions to grant release.  Def.'s Mot. at 32; Def.'s Reply at 17–19; *see also, e.g.*, *McCoy*, 981

F.3d at 286 (affirming district court's consideration of "the extent of the disparity between the

defendants' sentences and those provided for under the First Step Act," "the defendants' relative

youth . . . at the time of their offenses," the substantial time served by defendants, and

defendants' "substantial steps towards rehabilitation"); *United States v. Price*, Crim. No. 07-

0152-06 (ESH), 2020 WL 5909789, at *4 (D.D.C. Oct. 6, 2020) (finding that "changes to the

law . . . can present an extraordinary and compelling reason to reduce a defendant's sentence,

even in the absence of serious health issues"); *United States v. Vigneau*, 473 F. Supp. 3d 31, 36–

39 (D.R.I. 2020) (similar); Def.'s Mot. at 5, 32–33; Def.'s Reply at 18–19 (collecting cases).[12]

---

[12]   Notably, only two of the cases cited by defendant in support of this theory determined that some combination of changes in the law, a defendant's age at the time of the offense, and rehabilitation standing alone constituted an "extraordinary and compelling reason" justifying compassionate release.  *See McCoy*, 981 F.3d at 286; *Vigneau*, 473 F. Supp. 3d at 36–39, 39 n.8.  The overwhelming majority of the remaining cases based their decision in favor of release at least in part on the defendant's advanced age or medical conditions and are distinguishable on that ground.  *See Price*, 2020 WL 5909789, at *6 (noting that defendant's age and medical conditions put him "at greater risk from the COVID-19 pandemic than a younger and healthier inmate"); *United States v. Mack*, Case No. 2:98-cr-162, 2021 WL 1099595, at *4 (S.D. Ohio Mar. 23, 2021) (considering, among other factors, "defendant's health concerns"); *United States v. Parker*, 461 F. Supp. 3d 966, 980 (C.D. Cal. 2020) (finding that defendant's "serious" medical conditions, "in connection with the COVID-19 pandemic, present 'extraordinary and compelling' circumstances" before turning to consideration of changes in applicable sentencing law); *United States v. Vargas*, No. 88-CR-325 (VEC), 2020 WL 6886646, at *8 (S.D.N.Y. Nov. 24, 2020) (finding extraordinary and compelling defendant's "rehabilitation in conjunction with his unduly harsh sentence, his medical issues and heightened risk of severe illness or death due to the COVID-19 pandemic"); *United States v. Jones*, 482 F. Supp. 3d 969, 984 (N.D. Cal. 2020) (granting compassionate release after "consider[ing] the significant changes in law since [defendant's] sentencing" and his "heightened risk of complications from COVID-19"); Order at 3, *United States v. Smith*, Case No. 14-cr-189 (TSC) (D.D.C. May 14, 2020), ECF No. 76 (finding that in addition to changes in the law, the defendant's "age, health, and the COVID-19 pandemic all weigh in favor of a sentence reduction"); Order at 6–7, *United States v. Morefield*, No. 2:13-cr-2113-SAB-1 (E.D. Wash. Apr. 19, 2021), ECF No. 321 (similar); Def.'s Mot. at 5 (collecting additional cases and noting that each "granted compassionate release to individuals with extraordinary and compelling health conditions" in light of "significant changes in the law" and "their exceptional accomplishments and prison records").  In the one outlying case, the government conceded that "there [we]re sufficient reasons supporting [the defendant]'s request for immediate release" and disputed only the court's "authority to determine if extraordinary and compelling reasons justify early release . . . in light of the First Step Act's amendment of § 3582(c)(1)."  *United States v. Perez*, Case No. 88-10094-1-JTM, 2020 WL 1180719, at *2–3 (D. Kan. Mar. 11, 2020).

Some courts may be construing the First Step Act's compassionate-release amendment as a broad invitation for wholesale revisiting of otherwise-final sentences for any reason that appears to be justified to the presiding Judge, as defendant urges, but this is not the approach that this Court will adopt.  A determination that the factors suggested by defendant qualify as an extraordinary and compelling reason for release would undermine the limits on the availability of sentence-reduction proceedings based on changes in the law established in section 404 of the First Step Act.  That section restricts such proceedings to cases involving "covered offense[s]," First Step Act § 404(b), defined as those offenses "the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010," *id.* § 404(a), and further confines them to cases in which (1) the original sentence was not "previously imposed or previously reduced" pursuant to the Fair Sentencing Act of 2010 ("Fair Sentencing Act"), Pub. L. No. 111-220, 124 Stat. 2372, and (2) a previous motion for reduction in sentence under the First Step Act was not "denied after a complete review of the motion on the merits," First Step Act § 404(c).  To treat changes in the law and related mitigating factors as an extraordinary and compelling reason would effectively override these statutory limitations with a definitional sleight-of-hand by allowing any defendant sentenced under any subsequently amended statute to seek early release under 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act, and thus to avoid the threshold requirements set forth in section 404.  Such a result stands in tension with Congress's intent, made plain in section 404, to cabin the availability of sentence-reduction proceedings premised on shifts in the legal landscape to only those defendants sentenced under statutes later revised by the Fair Sentencing Act.  The factors suggested by defendant therefore do not constitute an extraordinary and compelling reason for release.  Even if they qualified as

extraordinary and compelling reasons, as explained below, these factors would not warrant compassionate release in defendant's case.

As to shifts in the controlling law, defendant contends that the transition from mandatory to advisory Guidelines introduced by *United States v. Booker*, 543 U.S. 220 (2005), and the statutory reduction of "the amount of crack cocaine necessary to trigger increased penalties in the drug statutes" in the Fair Sentencing Act, Def.'s Mot. at 38; *see* 21 U.S.C. § 841(b) (2010), made retroactively applicable to defendant in section 404 of the First Step Act, "underscore that the amount of time he has so far served is sufficient but not greater than necessary to fulfill the purposes of sentencing," Def.'s Mot. at 38.  Of the five counts of which defendant was convicted, his sentence has already been reduced to time served on Count 11, *see White II*, 413 F. Supp. 3d at 52, and defendant does not contend that the statutory penalties applicable to him have changed with respect to Counts 8 and 10, *see* Def.'s Mot. at 38.  He argues principally that the relevant statutory penalties for Counts 1 and 5, the two conspiracy charges carrying a maximum penalty of life imprisonment, have been reduced.  *Id.*

This assertion appears to be based on the D.C. Circuit's conclusion, in reviewing this Court's disposition of defendant's initial First Step Act motion, that when considering a sentence reduction under section 404(b) of the First Step Act, "the court must use the revised penalty range now applicable to the drug amount in the original statute of conviction."  *White III*, 984 F.3d at 86.  Defendant was "convicted of a conspiracy to distribute at least 50 grams of cocaine base," in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iii) (1993).  *Id.*; *see also id.* at 83.  That statute imposed a penalty range of "not . . . less than 10 years or more than life" imprisonment, 21 U.S.C. §  841(b)(1)(A) (1993), for individuals convicted of a violation involving "50 grams or more of a mixture or substance . . . which contains cocaine base," *id.* § 841(b)(1)(A)(iii), which

range carried over to Count 1 against defendant, *see id.* § 846, and enhanced his maximum penalty under Count 5 to life imprisonment, *see* 18 U.S.C. §§ 1962(d), 1963(a) (1993).  After the Fair Sentencing Act, however, the penalty range for offenses under § 841 involving 50 grams or more of crack is five to forty years imprisonment.  *See* 21 U.S.C. § 841(b)(1)(A).  As a result, if defendant were sentenced for the offenses as charged today, he would be subject to the five-to-forty-years imprisonment range for Count 1, *see id.* § 846, and to a maximum term of imprisonment of twenty years for Count 5, *see* 18 U.S.C. §§ 1962(d), 1963(a).

As noted, the presiding Judge found more than twenty-one kilograms—21,000 grams—of crack cocaine attributable to the First Street Crew conspiracy.  May 11 Sentencing Tr. at 93:1–2, 132:8–12; *see also White II*, 413 F. Supp. 3d at 22, 24.[13]  Even after the Fair Sentencing Act, the statutory range for violations of 21 U.S.C. § 841 involving this amount of crack cocaine remains "a term of imprisonment" of "not . . . less than 10 years or more than life."  21 U.S.C. § 841(b)(1)(A); *see also id.* § 841(b)(1)(A)(iii) (applying this penalty to individuals convicted of a violation involving "280 grams or more of a mixture or substance . . . which contains cocaine base").  Thus, while the statutory ranges for the offenses of which defendant was convicted have changed if assessed by reference to the penalty range applicable to the drug amount in the original statute of conviction, they remain unaltered if assessed by reference to the drug amount actually attributed to defendant.  *See* 18 U.S.C. § 1963(a); 21 U.S.C. § 846.  Though the Circuit has directed that the drug amount of the original statute of conviction be used to resolve motions under section 404(b) of the First Step Act, *see White III*, 984 F.3d at 86, it has not held that this

---

[13]    While the jury in defendant's trial made no specific findings as to the quantity of crack cocaine attributable to the conspiracy, *see* Trial Tr. (Jan. 28, 1994) at 30:4–9, 45:7–15, ECF No. 320; Verdict Form (Mar. 2, 1994), ECF No. 238, the D.C. Circuit has clarified that "[t]he court may consider both judge-found and jury-found drug quantities" in resolving defendant's renewed motion for reduction in sentence under the First Step Act, *White III*, 984 F.3d at 88.

requirement extends to consideration of changes in statutory penalties as a factor supporting compassionate release.  The question of how to calculate defendant's statutory range for purposes of the instant motion need not be resolved, however, to conclude that the continued availability of life imprisonment to penalize conspiracies involving the quantity of crack cocaine for which the sentencing Judge found defendant accountable weighs against a determination that the law has changed so dramatically, and renders defendant's sentence so unjust, as to supply an extraordinary and compelling reason for release.[14]

Defendant further speculates, based on the presiding Judge's criticisms of the then-mandatory Guidelines regime during his sentencing hearing, that the Judge "would have varied below the range" given the opportunity, Def.'s Mot. at 40; *see also id.* at 39–41, but this theory is nothing more wishful thinking that is undermined by the Judge's remarks specific to defendant. As to defendant, the Judge determined that a life sentence was warranted "because if witnesses can be intimidated, injured or killed, all the crime bills Congress may pass will be just illusions, limited in practical effect," May 11 Sentencing Tr. at 93:23–25, and cabined his generalized frustration with the mandatory Guidelines as applied to low-level drug offenders, stating that "[his] reasoning[] [was] not applicable to major drug dealers" such as defendant, *id.* at 92:3–4.

In further support of his argument that the sentencing Judge would have varied in his case, defendant relies on statistics about crack cocaine sentences imposed under the advisory Guidelines regime, indicating that in recent years more defendants convicted of crack-related offenses were sentenced outside the applicable Guidelines range than within it.  Def.'s Mot. at 40.  As the government points out, however, these statistics do not capture the particular

---

[14]        Indeed, calculated by reference to the judge-found drug quantities allocated to the First Street Crew, defendant's advisory Guidelines range of life imprisonment "would remain unchanged."  *White II*, 413 F. Supp. 3d at 51.

circumstances of defendant's offense conduct that resulted in a Guidelines range of life imprisonment. *See* Gov't's Opp'n at 22; *supra* Part I (describing enhancements applied to defendant's offense level under the Guidelines). For example, defendant contends that "in fiscal year 2020, only 37.7 percent of crack cocaine sentences were within the advisory Guidelines range, while . . . 43.0 percent[] varied from that range," Def.'s Mot. at 40 (citing *2020 Annual Report*, *supra*, at tbl. D-14), but this statistic reflects sentences imposed on all defendants convicted of any crack-related offense. Offenders similarly situated to defendant make up only a tiny fraction of that group. To take just two of the enhancements applied to calculate defendant's Guidelines range, of all defendants sentenced for a crack-related offense in fiscal year 2020, under 40 percent received an enhancement for possession of a weapon, *see 2020 Annual Report*, *supra*, at tbl. D-8, and only 5.6 percent received an aggravating-role enhancement, *id.* at tbl. D-9. Though defendant counters that "[t]he percentages of defendants who receive each enhancement say[] nothing about whether a court ultimately sentenced those defendants within the range recommended by the advisory guidelines," Def.'s Reply at 21, the statistics do suggest that the severity of defendant's underlying offense conduct differs substantially from that of the typical crack offender. Comparisons to the rate of variance in sentences imposed with respect to all crack offenders are therefore not particularly helpful to determining whether defendant would have received a variance below the Guidelines range were he sentenced today.

Defendant next contends that his "relative youth of 17 to 22 years old at the time of the offenses is an extraordinary and compelling reason to reduce his sentence . . . because of changes in our understanding of the maturation process of young men well into their mid-to-late twenties and their capacity for transformational rehabilitation, mitigating factors [defendant] was barred from relying upon to receive a sentence below the mandatory Guidelines range in 1994." Def.'s

Mot. at 34; *see also id.* at 46–49.  He cites to a number of scientific and popular sources in support of this argument, *see id.* at 46–49, but as legal authority, relies primarily on decisions of the Supreme Court recognizing the reduced responsibility and potential for rehabilitation of juvenile offenders, *see id.* at 46–47 (citing *Montgomery v. Louisiana*, 136 S. Ct. 718, 734 (2016); *Miller v. Alabama*, 567 U.S. 460, 471 (2012); *Roper v. Simmons*, 543 U.S. 551, 569–70 (2005)).  Defendant, however, was not a juvenile when most of the offense conduct occurred.  He was twenty-two years old when he was arrested and twenty-four years old at the time of sentencing.  Def.'s Mot. at 9, 46.  Though his age at the time of the offenses might properly be considered as a potential mitigating factor in assessment of the § 3553(a) factors, it does not present an extraordinary and compelling reason to grant compassionate release.

Finally, defendant proffers that "the significant and inspirational advances [he] has made in his mindset and his selfless acts towards others . . . are extraordinary and compelling reasons for his release."  Def.'s Mot. at 34; *see also id.* at 49–58; Def.'s Reply at 22–25.  To make this argument, defendant references the substantial and admirable steps he has taken while incarcerated to obtain his paralegal certificate with an A+ average, *see id.*, Ex. 7, Letter & Diploma from School of Paralegal Studies ("Paralegal Diploma"), ECF No. 732-2; to participate in additional academic and vocational programs, including a commercial driver's license course, *see id.*, Ex. 8, BOP Summary Reentry Plan & Progress Report (Mar. 18, 2021) ("Progress Report") at 1–2, ECF No. 732-2; and to serve as a tutor and mentor to other inmates, *see id.* at 50–51.  According to his case manager at FCI Schuylkill, defendant "maintains a positive rapport with staff and inmates alike" and "achieves good work performance evaluations."  Progress Report at 3.  He has had no disciplinary reports since 2009, *see* Def.'s Mot., Ex. 8, Inmate Discipline Data (Dec. 29, 2020), at 10, ECF No. 732-2, and "was approved for transfer to a Low

security institution," although the transfer was put on hold due to COVID-19, Progress Report at 3.  During the pandemic, he has "volunteered to work as a[n] . . . orderly."  Def.'s Mot. at 51. Defendant even started an organization with other inmates called Project D.A.D. ("Donate-A-Dollar") that raises money from inmates and donates it to community organizations "to illustrate to the people in the community that [the inmates] care about the problems that they endure and were committed to helping however [they] could."  Def.'s Mot., Ex. 6, Email from Eric A. Hicks to Joanna Perales (Apr. 12, 2019, 5:51 PM), ECF No. 732-2.[15]

Beyond these accomplishments, defendant expresses genuine remorse for his actions.  He describes himself as a person "who is striving to make amends to those who were hurt by his poor judgment and . . . who sincerely cares about paying his debt to society," Def.'s Mot., Ex. 1, Hicks Letter to the Court (Mar. 4, 2019) at 2, ECF No. 732-2, and states that his "continued mission" is "to make amends for [his] actions as a young man," a mission he characterizes as "a lifelong commitment . . . and the most sincere way that I know to apologize to everyone who was affected by my actions," 2021 Hicks Email at 1.  He also enjoys significant support from his wife, children, family, and friends, many of whom submitted letters in support of his release, remarking on the important role he plays in their lives and their willingness to facilitate his reentry into the community in whatever way possible.  *Id.*, Ex. 2, Letters from Debra M. Hicks (wife); Ex. 3, Letters from Bernard Payton & Kavon Rayford (son and stepson); Ex. 4, Letters from Dan R. Hutchinson, Jr., Evonne Natasha Hicks, Sandra Beatty, & Tracy Beatty (friend, sisters, and aunt); Ex. 5, Letters from Sean Scott, Juan C. Luna, & Joseph Arnold (individuals

---

[15]    The government characterizes defendant's conduct while incarcerated as "good (though not exemplary)," Gov't's Opp'n at 22, and contends that many of defendant's "educational courses . . . were initiated in the wake of his First Step Act motion," implying that the government believes defendant only undertook these efforts to bolster his motion, *id.* at 23.  In fact, defendant earned his paralegal certificate in 2002, more than fifteen years before the First Step Act was passed in 2018, *see* Paralegal Diploma, and completed additional academic programs in 2003, 2007, and 2012, *see* Progress Report at 1–2.  In short, the Court recognizes that defendant has made impressive strides for which he deserves credit.

tutored or mentored by defendant while incarcerated); Ex. 10, Letters from Demetria Atkinson &

Ernest Smith (family friends expressing willingness to facilitate defendant's participation in

reentry programs and employment opportunities), ECF No. 732-2.

As defendant acknowledges, however, his rehabilitation alone, though commendable,

cannot be considered as an extraordinary and compelling reason for release, 28 U.S.C. § 994(t);

*see* Def.'s Mot. at 22; *supra* Part III.A, and thus the conclusion that defendant has not established

any other extraordinary and compelling reason forecloses a finding that his progress while

incarcerated is sufficient to justify release.  Defendant has therefore failed to establish an

extraordinary and compelling reason for release.  In the absence of this showing, defendant does

not satisfy the threshold requirement for release under 18 U.S.C. § 3582(c)(1)(A), and the

§ 3553(a) factors need not be addressed.

## IV.   CONCLUSION

For the foregoing reasons, defendant has not demonstrated that a reduction in his

sentence comports with the requirements under 18 U.S.C. § 3582(c)(1)(A).  Accordingly, his

Emergency Motion for Compassionate Release must be denied.

An order consistent with this Memorandum Opinion will be entered contemporaneously.


Date: April 27, 2021


_____
BERYL A. HOWELL
Chief Judge